Complainant seeks to establish an equitable debt against the defendant in an amount equal to the moneys expended by complainant for medical services and expenses attending the last illness of complainant's mother, as well as for her burial expenses.
The complainant and defendant are father and son. Defendant and his wife, now deceased, separated in June of 1929 and continued to live apart thereafter. The wife died in July of 1941. The last illness of the deceased spouse started in November of 1940, when she was admitted to a hospital and underwent a major operation. She recovered from the effects of this operation but was compelled to return in June of 1941, where she remained until her death, caused by sarcoma of the uterus.
The allegation of the bill is that during the time of the wife's illness as aforesaid, she "had no means to provide" and defendant failed and refused to provide for her the expenses,c., incident to an attempt to cure her.
Defendant insists that during the separation of his wife and himself he made suitable provisions for the support and maintenance of the wife and his credit was not pledged by the wife, but that complainant expended the moneys in question "through filial sympathy, voluntarily, independent of agreement or contract, expressed or implied."
Defendant says that when the separation occurred the provision made for his wife's support was that he agreed to permit her to collect and retain all the rents and profits arising from the operation of two properties situate at 209 North New Hampshire Avenue and 229 South Congress Avenue, Atlantic City, New Jersey, "which properties were originally purchased by defendant with his own funds, and that since 1929 complainant's mother did collect said rents and profits and applied the money to her own use."
The evidence justifies a finding that as of the date of the separation between husband and wife, they were the owners by the entirety of the two properties above mentioned and that these properties had been acquired since the marriage of the parties in 1909; that during their married life and while *Page 461 
the parties remained together, the wife rented rooms in both properties, and that the husband and wife, with their children, occupied very limited quarters in one of the properties in order to increase the income therefrom; that they otherwise lived frugally. The husband was a tailor and during a portion of the years 1920 and 1921 says he made in excess of $100 per week in his business. He says it was his money that purchased the real estate and I believe that it was. His contributions to the support of the household were not liberal but were augmented by the room rents. Checks of Mrs. Levin produced at the final hearing showed that the purchase price for the Congress Avenue property came through her bank account, but even so, I am satisfied that the moneys were actually those of the husband. It was he who at that time was the money-earner and not his wife. It is true that the wife took over the room rents, but I am satisfied that these moneys were used, in the main, for household expenses.
We are not particularly concerned with the above details, but direct our main inquiry as to whether, when the final separation came, the husband made arrangements to provide for the maintenance of the wife and children. As to the cause leading up to the separation, if the testimony of the husband is to be believed, he was justified in leaving the home. Of course, no living person can deny his version of the causes for separation, but even if the fault was his and he abandoned his wife unjustifiably, still, if he made suitable provision for her support and that of the children, this action will not lie.
Defendant says that shortly after he had left the home he and his wife agreed that she should have the income from the properties aforesaid for her support and that of the children, and that he would not return to the home again. No living person may deny this, even though the two boys (now men) did give some testimony which might throw some doubt on defendant's version. However, when we realize that from June, 1929, to the end of the mother's days, approximately twelve years, the mother and father remained apart, and that during all that time she managed the properties, collected the rents and kept them as her own, without a further demand *Page 462 
on her part for assistance from the defendant, we must conclude that she did so either in accord with an express understanding, as contended for by the defendant, or at least under an implied understanding of that character. It is also quite evident that though the boys tried to make it appear otherwise, the income derived by the wife was ample for her needs and those of her children. She was enabled not only to provide a home and the necessities of life and clothing for herself and the two children, but she paid for a college education for one boy at the University of Pennsylvania and for the other boy at the University of Michigan, and in addition to this, accumulated a bank account which in 1933 was over $500, and also an interest in building and loan shares with a withdrawal value of approximately $600. In addition to this, she carried a $1,000 life insurance policy on her own life, with complainant as beneficiary, and may have and probably did insure the lives of the sons.
It is true that the sons testified that the income from the properties had diminished in 1940 and 1941, but even so, the mother did not seek greater assistance from the defendant and in so far as she was concerned, by her silence, gave assent to the continuance of the maintenance arrangement.
After the sons graduated from college, their financial assistance to the mother was not demanded by her and they contributed nothing more than would be expected as voluntary offerings, and these contributions, to their credit, were spontaneously made. The mother had weathered the storm of the college years and I am satisfied was able to carry on thereafter through her own resources, gained from the aforesaid properties and augmented by some other income from a property she had purchased, and it is sure that she did not seek out the husband for greater assistance.
It is argued that inasmuch as the wife was an owner by the entirety of the realty, she was not receiving support from the husband but was, in fact, earning her support and that of the children through her own work in managing the realty, renting rooms, c. She was undoubtedly contributing her work and efforts but she was assisted by the contribution of the husband's interest in the properties, and by his assent. *Page 463 
Both the husband and wife were satisfied with the separation arrangement.
In this posture of affairs, the wife became ill in November of 1940 and on November 11th of that year entered a hospital and was operated upon, returning to her home in February of 1941. She returned to the hospital in June of 1941 and was operated upon again and died July 24th, 1941. During the interval between November and June, the wife was able to be about. She was ailing but was mentally capable and physically able to call upon defendant for financial assistance, which she never did, and during this same time she lived in the property and received its income, the amount of which does not appear, and she also received other income from property owned by her, as well as from additional property which she rented.
Complainant testified that he never talked with his mother about the expense of her treatment in the hospital or otherwise, so that she could not have pledged the credit of her husband therefor, and so that she did not even know, in fact, whether she was expected to eventually pay them herself.
Complainant says the father, at the outset of the wife's illness, said that he would not be responsible for any medical assistance or otherwise, and throughout the period of the wife's illness maintained that attitude.
The evidence further shows that the father lives in the rear of a small room which he occupies as a tailor shop, that this room is unheated and that his earnings are $15 per week in the summer and less in the winter; that he has neither bank account or property, other than his interest in the real estate aforesaid. There is no evidence to the contrary.
The foregoing are the essential facts adduced from the evidence. That which does not appear, but which was plainly evident to the court, is the intense animosity existing between father and sons, and the proneness of the interested witnesses to permit this feeling to warp their testimony. This is particularly so with defendant, to the extent that I disbelieve him in many phases of the case, but I cannot disbelieve that which is borne out by the circumstances of the case and the attitude of the father and mother during their joint lives, *Page 464 
with respect especially to the separation agreement being as contended for by the defendant.
There is one other factual situation which should be adverted to. In arranging for the funeral for his mother, complainant purchased a burial plot for the decedent and paid therefor $115, and this notwithstanding the fact that the sales agent advised complainant that the lodge to which the father belonged would furnish a burial plot free. By this act, and complainant's talk with the sales agent, Mr. Shapiro, it is quite evident that neither complainant or his brother, or his family, wanted anything to do with the father, and it may well be that this was complainant's attitude with reference to the care of the mother during her fatal illness. I am not holding that that attitude was not justified by what a son thought his father's treatment of the mother had been, but to indicate that a person, be he a member of the family or an outsider, may not fasten an equitable debt on another beyond that which is recognized under the law, as laid down in various cases herein discussed.
I do not consider it necessary to discuss the question as to whether or not the expenditures made by the son are in proportion to the amounts which the circumstances of the parties, husband and wife, warranted, the financial condition of the father being considered, because I find that complainant, on the facts and the law, may not recover. However, as to the expenditures, it does appear that they were much in excess of that which defendant's financial condition would warrant.
In Leuppie v. Osborn, 52 N.J. Eq. 637; 29 Atl. Rep. 433,
the general principle is laid down:
"When a husband deserts or abandons his wife, without making provision for her support, and a third person advances money to her, which she uses to obtain necessaries, an equitable debt is thereby created, which the person making the advance may enforce by suit in equity."
The elements of this rule of law are (a) the desertion or abandonment of the wife; (b) without provision for her support; (c) the furnishing of necessaries or their equivalent by a third person. From the evidence herein, the element *Page 465 
"A" is possibly supplied by the fact that husband and wife were living in a state of separation; the element "B" is not proved but, on the contrary, provision for support had been made. In the above case the court cites with approval (at pp. 640, 641), the reasoning of the court in Kenyon v. Farris, 47 Conn. 510:
"That it can make no difference to the husband, whether he is held liable for money or for the price of necessaries, so long as no recovery for money can be had, unless it is shown that it has actually been spent for necessaries; that whether the wife obtains what she is entitled to by one means or the other, the law will discharge its whole duty to the husband by protecting him from liability for anything beyond necessaries, but it cannot discharge its duty to her unless it compels him to support her.If he has a choice as to the method in which he will extend support, the law will let him exercise it, but if he refuses to make a choice and does not provide for her in any way, then she should have a right to resort to any means which will give her what she needs."
In the instant case the husband's choice, acceded to by the wife during her lifetime, was that she receive her support, c., from the income of the properties in their joint names. The husband had exercised his choice (the wife had acquiesced therein) and the law permitted him to do so; it is not for the son or an outsider to say that that choice was insufficient for the needs of the parties, especially in cases where the wife has not pledged her husband's credit beyond that point.
Also in the Leuppie v. Osborn Case, supra, the court said (at p. 641): "It is only in cases where he has deserted or abandoned his wife, without making provision for her support, that he has been held liable for money advanced. This is the utmost extent to which his liability, by force of this principle, has as yet been carried."
In Asche v. Wakeley, 112 N.J. Eq. 60; 163 Atl. Rep. 278,
the court held: "A son who advances funds to effect his mother's cure cannot recover from her husband, in the absence of a pledge by her of his credit." In this case the husband agreed that consultation with a specialist was necessary for the complete recovery of the wife but protested that he did *Page 466 
not have the means to employ the specialist. The son, however, did employ the specialist for the mother and paid the bill, but was denied recovery, and the court said (at p. 62): "To bind the husband at law or in equity, his credit must be pledged."
The evidence herein shows that the husband refused assistance at the outset of his wife's illness; that the son never consulted the mother about the expenditures and that she never pledged her husband's credit. There is also nothing to show that the son expected to be reimbursed by the father at the time the expenditures were made. I think he must have known that his mother had named him (the son) as beneficiary in the $1,000 life insurance policy, the amount of which he collected after the mother's death, but the inference from the evidence is that the son knew nothing of the theory of an equitable debt until after he had consulted an attorney after the death of the mother, at which time notice had been served by the father that he was the sole owner of the real estate.
The court's finding in the Asche v. Wakeley Case, supra, was that the son made the expenditures "through filial sympathy, voluntarily, independent of contract, expressed or implied." I so find under the facts of this case.
In Systma v. Bonte, 108 N.J. Eq. 493; 155 Atl. Rep. 609,
the husband deserted the wife and under a support order paid the wife $8 per week. Later on an operation was performed on the wife, for which the complainant paid. The court held that the defendant was not liable, that the order of the court fixed the limit of the husband's liability. It is true that in that case the Court of Chancery assumed that the court order was "fixed in reasonable relation" to the income of the husband, and "it is also to be presumed that this amount bore a fair relation to what she had reason to expect, since she has never brought any maintenance action or other proceeding to obtain an additional allowance from him."
In the instant case it is presumed that the support agreed upon by the husband and wife, and acceded to for twelve years, was adequate. Surely the court may not assert that *Page 467 
that which was satisfactory to the parties was not the limit of the husband's liability.
In this case, like that in Systma v. Bonte, supra, the amount of the expenditures by the son, while justified by filial devotion, would not appear so to have been from the financial standpoint of the father.
A decree may be entered dismissing the bill of complaint.